STATE OF WEST VIRGINIA *v.* W. D. ESTEP *et al.*

(No. 7697)

Submitted April 25, 1934.   Decided May 22, 1934.

*Wade H. Bronson* and *Goodykoontz & Slaven,* for appellant.

*Hogg & Crawford,* for appellee Griver-Pfarr & Co.

HATCHER, JUDGE:

This is a proceeding of the school commissioner to have certain tracts of land sold as forfeited to the state. One of the tracts embraces the mineral of a five-acre parcel. Burning Creek Marrowbone Land Company (hereinafter called Land Company) and Griver-Pfarr & Company (hereinafter referred to as Griver) are rival claimants of that mineral. The circuit court found in favor of Griver.

The Land Company is the grantee under two chains of title. The first emanated from James Evans (Sr.), who owned the tract in 1889. In that year, Evans and wife granted to Samuel Ferguson a tract of 329 acres subject to the following reservations: "But the parties of the first part hereby reserve out of the boundary of the said 329 acres of land the surface right to two acres of land at the mouth of the Tomahawk branch, and also another certain tract or parcel of land in the boundary of the said 329 acres of land bounded and described as follows: * * * containing forty acres." The forty acres so reserved embrace the five acre parcel in controversy. The Land Company claims the mineral of the forty acres as a remote grantee of Ferguson, and contends that only the surface of the forty acres was reserved by Evans. In furtherance of that contention there is evidence that the two acres of surface are within the forty-acre tract. We do not see how that fact aids construction. The two acre reservation is seemingly void for want of description. Be that as it may, the deed dealt

with the two tracts as if separate. The word "also" in the reservation is clearly adverbial and not connective. The description of the two acres is completely separated from that of the forty acres. The natural import of the words—"also another certain tract or parcel of land"—signifies the entire body of the land. We see no reason for not giving to the words their usual meaning.

The title of James Evans, Sr., to the forty-acre tract passed to Levi Evans in 1891. On September 16, 1897, Levi and wife made a general warranty deed to his brother James Evans, Jr., conveying the mineral on the tract of forty acres. On the same day, Levi and wife made a general warranty deed to his brother-in-law, Richard Gillman, granting "all that certain lot or parcel of land," etc., containing five acres. The Land Company's second claim is under James Evans, Jr. Griver claims under Gillman. The five acres described in the Gillman deed is within the forty acres described in the deed to James Evans, Jr. Both of these deeds were acknowledged before the same notary public on September 18, 1897, and both were filed for recordation in the office of the county clerk on September 20, 1897. The deed to James Evans, Jr., was recorded in Deed Book No. 3, at page 407, and the deed to Gillman was recorded in the same deed book at page 412. A witness who was deputy clerk when the deeds were recorded, testified that it was customary to record deeds in the order filed. That custom has little, if any, probative value in this instance. Suppose the two deeds were filed simultaneously. One would necessarily precede the other on the deed book; yet that precedence would have no significance. Moreover, the recording statutes are designed to protect one without notice of another's right. We cannot assume that Levi intended to cozen either of his kinsmen. The relationship of the parties, in connection with the coincidence of the dates, acknowledgements and recordations of the two deeds, indicates *prima facie* that each grantee knew of the deed to the other.

The grantor attempted to testify what he intended to

convey. But both grantees are dead. Therefore the grantor's explanation is inadmissible. Code 1931, 57-3-1.

Much of the abstract argument advanced in favor of one grantee seems to apply equally in favor of the other. In a situation so difficult, slight circumstances will tip the scale. In the early case of *Van Horne* v. *Crain,* (1829) 1 Paige Chy. (N. Y.) 455, it was held: "Separate instruments executed at the same time and relating to the same subject matter, may be construed together and taken as one instrument." The later case of *Craig* v. *Wells,* (1854) 11 N. Y. 315, 320, explained that the rule required "an identity of parties". See generally 18 C. J., subject Deeds, sec. 229; 8 R. C. L., subject Deeds, sec. 102; Devlin on Deeds (3d Ed.), sec. 845. The deeds in question must be taken as having been executed simultaneously. They have as common subject matter the mineral on the five-acre tract. While we cannot treat both as one instrument, we can consider them collectively. Such consideration favors Gillman. The description in his deed calls for certain lines of the forty-acre tract, "so as to include five acres of said survey". By that expression, the five acres are carved out of the forty acres. The several monetary considerations mentioned in the two deeds also have some significance. The Gillman deed recites a consideration of $50.00, which is an even multiple of five (acres). The James Evans, Jr., deed recites a consideration of $35.00 which is an uneven multiple of forty (acres), to-wit, 87½c per acre. It does not seem likely that those brothers would have haggled about the purchase to the extent of halving one cent, particularly when no such chaffering is apparent on the deed to the brother-in-law. One may conjecture plausibly that the price per acre for the mineral was $1.00 and that only $35.00 was paid by James Evans, Jr., because five acres of the forty went to Gillman.

Gillman and those claiming under him improved the surface of the five acres, and have remained continuously in actual possession thereof. Ferguson and those under him have had possession of mineral within their boundary. But there was no physical possession of the

mineral on the forty acres by anyone, until 1926 when a producing gas well (*causa belli*) was drilled by Griver. Both the James Evans, Jr., and the Gillman titles have bad tax records. The former paid no taxes in 1898, and again in 1902. It was sold by the sheriff for each delinquency and conveyed to several purchasers by tax deeds. (Those purchasers are remote grantors of the Land Company.) This title paid no taxes subsequent to 1918 until after this litigation had commenced, when in 1930 the school commissioner permitted redemption. At that time, the Gillman (Griver) title was not before the court. The latter title was off the land books in 1898 and 1899. Its non-payment of taxes in 1908, and its consequent purchase by the state is charged. It has paid no taxes since 1922, but was tendered the right to redeem in this suit.

The forty acres of mineral have seemingly been included in a larger tract charged on the land books to Ferguson and his grantees. No tax delinquencies are charged against the Ferguson title. Wherefore, and by reason of possession of contiguous mineral, the Land Company contends that it acquired both the J. Evans, Jr., and the Gillman titles under the Constitution, Article XIII, section 3, when those titles were forfeited to the state in the early years of 1920. The deed by which the Land Company acquired its title states that the lands granted are the same conveyed to the Twelve Pole Coal and Iron Company by S. J. Ferguson on April 15, 1889. The deed from Ferguson to the Twelve Pole Company (a) grants the 329 acres described in his deed from James Evans (Sr.); (b) excepts the surface to two acres and also the tract of forty acres in the identical language employed in the Evans deed; and (c) states that the tract conveyed is the same land conveyed by Evans on April 4, 1889. Thus by specific reference, the Land Company's title is limited to that of Ferguson. We have held that the forty acres were excepted from the grant to Ferguson. It necessarily follows that the forty acres are also excepted from the Land Company's deed. The company is therefore without the legal claim

or color to the forty acres requisite for a transference of the state's title under the Constitution.

Code 1899, 31-25, provides that when the purchase of a delinquent tract is consummated by deed from the clerk, the purchaser acquires not only the title of the designated delinquent, but also the interest of any other person having title thereto who has not paid the taxes thereon for the year for which the property is sold. The J. Evans, Jr., mineral was charged on the land books in 1898 as an entire tract of forty acres. Since the Gillman five acres in fee was off the land books and paid no taxes for the year 1898, and the J. Evans, Jr., mineral was sold for a tax delinquency of that year, the purchaser of the Evans claim acquired the entire forty acres of mineral, including the mineral of the Gillman five acres. Counsel for Griver point to several errors in the clerk's deed relating to the interest and to the description of the property conveyed, etc. We are of opinion that the deed is rid of the errors by the curative provisions of the above statute. *Fleming* v. *Charnock,* 66 W. Va. 50, 66 S. E. 8, 18 Ann. Cas. 711. It makes no difference whether the interest attempted to be conveyed by the clerk in such case is greater or less than the interest reported sold by the sheriff. The deed is valid as to the interest actually sold. *Wagner* v. *Beavers,* 85 W. Va. 631, 635, 102 S. E. 668.

Gillman sold to Brewer, who evidently not realizing that he had lost his mineral through the delinquency of 1898, had the five acres charged to himself in fee on the land books. With the exception of the year 1908, Brewer and those claiming under him paid all the taxes on the five acres from 1900 to 1922, inclusive, and occupied continuously the surface of that tract. By reason of all which, Griver contends that when the J. Evans, Jr., title was forfeited to the state for non-payment of taxes in 1918, the Gillman title (to which all the estate in the land had been assessed) received that title from the state under the Constitution, Article XIII, section 3.

Three classes of claimants are recipients of the constitutional gratuities. A requirement of both the first

and third classes is "actual continuous possession". Af·
ter the mineral of the five acres had been severed from
the surface through the delinquency of 1898, the mineral
became an independent estate in the land, separate and
distinct from the surface. *Wallace* v. *Coal Co.*, 58 W. Va.
449, 52 S. E. 485, 6 Ann. Cas. 140. It is settled law that
after severance of the mineral, possession of the surface
"does not carry with it" possession of the mineral. *Plant*
v. *Humphries,* 66 W. Va. 88, 66 S. E. 94, 26 L. R. A.
(N. S.) 558; *Kiser* v. *McLean,* 67 W. Va. 294, 67 S. E.
725; *Gas Co.* v. *Moore,* 81 W. Va. 164, 168, 93 S. E.
1051. Consequently, the Gillman title had no actual
possession of the mineral in 1918 and the years imme-
diately following. The lack of such possession excludes
that title from the first and third classes of the Constitu-
tion.

The second class of claimants favored by the Consti-
tution includes one whose title would be valid "but for
the title forfeited." Possession is not required of the
second class. Griver contends that his title qualifies un-
der this class. The Land Company opposes this conten-
tion with the Brewer delinquency of 1908. The following
stipulation of counsel covers that delinquency:

> "That the only lands returned delinquent for
> 1908 taxes, Warfield District, Mingo County, in
> the name of Aaron Brewer, were the three
> tracts shown under that year on page 176 of
> the printed record herein, viz., 310 acres, 14
> acres and 100 acres. That, according to the
> delinquent return the taxes against the 310
> acres at that time amounted to $30.71.
> "That the record of real estate delinquent for
> 1908 taxes and purchased by the State shows
> the said 14 acres and the said 100 acres as pur-
> chased by the State on December 10, 1910. That
> the same record further shows a tract of 3
> acres, Bark Camp, Marrowbone Creek, sold to
> the State for the 1908 taxes in the name of
> Aaron Brewer at the same sale, and that the
> taxes, interest and costs thereon at that time
> amounted to the sum of $37.25. That the rec-
> ords show no redemption, and no tax sale to

any individual and no suspension of sale of a tract of 310 acres in the name of Aaron Brewer for 1908 taxes. That the purchase by the State of 3 acres, as above set forth, was subsequently duly certified by the Auditor of the State of West Virginia to the Commissioner of School Lands of Mingo County as a purchase of a tract of land shown as 3 acres."

There is evidence that the five acres in question was included in the 310 acres. Without controverting the evidence, Griver attempts by argument to create a doubt as to such inclusion. The doubt would be of no advantage to him. The 310 acres is a consolidation of several tracts. The five acres is either within the 310 acres, and in one of its constituent tracts prior to consolidation, or the five acres was off the land books for more than five successive years and was forfeited to the state under Constitution, Article XIII, section 6. Counsel for the Land Company contend that the 310 acres were actually sold to the state, and that the report of a sale of only three acres was a typographical error. Counsel say:

"Only three Aaron Brewer tracts were delinquent for 1908, and the sale to the State of the other two, 14 acres and 100 acres, is shown. The record shows no disposition of the 310 acre delinquency, except the State sale appearing as 3 acres. The fact that the delinquent record shows the taxes on the 310 acres as $30.71, and the sale record, appearing as 3 acres, shows the taxes on that tract as $37.25, also prove the identity of the 310 acres and the 3 acres. Counsel resort to Code 1899, chapter 31, Section 6, to prove that even though the 310 acres was offered for sale, only three acres were sold—that is, a part only of the tract. They overlook Section 31 of the same chapter, Code 1899, which provides that a tract of land shall be bought for the State only when 'no person present bids the amount of taxes, interest and commissions due thereon'. The Code contains no provision for a bid or purchase by the State of less than the whole tract. Any purchase by the State is a purchase of the whole tract, or no purchase at all."

We are of opinion the contention is sound. Code 1899, 31-31, provides that when no person bids on a tract of real estate offered for sale by the sheriff, he "shall purchase the same on behalf of the state for the taxes thereon and the interest on the same." There is no provision for the sheriff to purchase less than the entire tract. The next section (32) provides that "all such estate, right, title and interest in the real estate" mentioned on the sales list furnished by the sheriff, which would have vested in an individual purchaser at the sale after obtaining a *proper deed* therefor, "shall be by the sale and the purchase on behalf of the state, vested in the state." Section 25 of the same chapter provides that if the *quantity* of a tract purchased by an individual, "be misstated" all the right, title, interest and estate therein "shall nevertheless pass to and be vested" (by the clerk's deed) in the purchaser; that no error in the sales list of the sheriff shall (after the deed to the purchaser) invalidate or affect the sale or deed; and that no sale of real estate shall be affected by a defective performance of a sales officer. We mind that section 25 excepts from its curative provisions an irregularity on the face of the proceedings which is *actually proven* to have misled the owner of the real estate sold, and to have prevented a redemption. Brewer knew he had not paid his taxes for 1908. He is chargeable with knowledge that a tax sale of his properties would follow. He never redeemed and never offered proof that he would have redeemed but for the mistake in the sheriff's report of the sale. Consequently, there is no ground for a presumption that he was misled by the mistake. Had the 310 acres been sold to an individual the erroneous listing of the tract as three acres on the sheriff's return would not have affected the purchaser's title to the 310 acres under section 25. *Leach* v. *Weaver,* 89 W. Va. 49, 54-5, 108 S. E. 494. Under section 32 the title of the state to the 310 acres is equally assured. *State* v. *McEldowney,* 54 W. Va. 695, 47 S. E. 650; *Collins* v. *Reger,* 62 W. Va. 195, 57 S. E. 743; *Hector Co.* v. *Jones,* 79 W. Va. 618, 92 S. E. 102.

This ruling but follows the plain provisions of the statute. Moreover, the tax record of the Gillman title since 1922 (failure to pay any taxes whatever) is not such as to invoke a strained construction of the tax laws in its favor. One of the conditions imposed by the Constitution upon a claimant of the second class is that his title be *not forfeited.* As the Gillman title was forfeited in 1908 and has not been redeemed from that forfeiture, Griver does not qualify under the second class.

Since Griver has no valid claim to the mineral in question, he is not concerned in the disposition thereof made by the state. It is of no moment that he was not a party to the redemption permitted the J. Evans, Jr., title. So far as this record shows, that redemption should be recognized.

The judgment of the circuit court is accordingly reversed. However, the Griver petition is not dismissed here, but the cause is remanded to give Griver opportunity to seek, if so advised, an allowance for drilling the well, under Code 1923, chapter 91; Code 1931, chapter 55, article 5.

*Reversed and remanded.*